**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| VINTON ANTONIO GRANT, II<br><br>Plaintiff,<br><br>v.<br><br>LAMBCON, INC., and<br>BRADLEY CONCRETE CO., INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:25-cv-555<br><br><br><br>JURY DEMANDED |

---

**COMPLAINT**

---

## I. Nature of the Case

1. This is an action seeking redress for the Plaintiff, Vinton Antonio Grant, II, for the conduct of the Defendants, Lambcon, Inc. and Bradley Concrete Co., Inc., in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended (Title VII) and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Section 1981). As stated with particularity below, Plaintiff Grant alleges that while he was employed by the Defendants, he was regularly subjected to racial harassment by his co-workers and supervisors, and that the Defendants terminated his employment because of his race and in retaliation for his protected activity of reporting racial discrimination and the hostile work environment to which he was subjected.

## II. Jurisdiction and Venue

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this case involves federal questions based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

3. Venue in the Eastern District of Tennessee is appropriate pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Knox County, Tennessee, which is included in this judicial district.

## III. Parties

4. Plaintiff Vinton Antonio Grant, II, is a citizen and resident of Knox County, Tennessee. Mr. Grant was formerly employed by the Defendants, Lambcon, Inc. and Bradley Concrete Co., Inc. Mr. Grant's work for Defendants was performed in Knox County, Tennessee, originating from Lambcon's Knoxville plant located at 1912 Woods Creek Road, Knoxville, Tennessee 37924.

5. Defendant Lambcon, Inc., is a Tennessee for-profit corporation. Its principal address is located at 62 2nd Street N.E., Cleveland, Tennessee 37311-5308. It may be served with process through its registered agent, G. Steven Lambert, at 475 Anatole Lane N.W., Cleveland, Tennessee 37312.

6. Defendant Bradley Concrete Co., Inc., is a Tennessee for-profit corporation. Its principal address is the same address as Lambcon located at 62 2nd Street N.E., Cleveland, Tennessee 37311-5308. It may be served with process through its registered agent, Gary S. Lambert, at 475 Anatole Lane N.W., Cleveland, Tennessee 37312.

7. Defendants Lambcon and Bradley Concrete are separate legal entities but functioned as joint employers of Plaintiff Grant. Bradley Concrete is also known as Lambcon. Mr. Grant's paycheck identifies Lambcon as his employer. Both entities, however, share the same principal address, registered agent, equipment, management, and workforce. Both Defendants comprise an integrated enterprise with operations so intertwined that they can be considered as the single employer of Mr. Grant and are subject to joint and several liability for actionable conduct against him. Both legal entities are listed together on a single website for the businesses, and each responded to Mr. Grant's EEOC Charge. References to Lambcon in this Complaint are to both Defendants as the single employer of Mr. Grant.

8. Mr. Grant is African American (also referred to herein as Black). Lambcon is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), and it employed Mr. Grant as relevant for coverage under Section 1981.

## IV. Conditions Precedent

9. Mr. Grant timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on December 17, 2024, alleging violations of Title VII of the Civil Rights Act of 1964 when he was subjected to racial harassment and discharged in retaliation for attempting to complain about the racial harassment.

10. After the EEOC investigated Mr. Grant's allegations, it issued a Determination Letter on July 10, 2025, stating, "The evidence indicates reasonable cause to believe Charging Party was subjected to racial harassment and discharged in retaliation in violation of Title VII."

11. Based on the EEOC's Determination in favor of Mr. Grant, the federal agency invited Lambcon to participate in conciliation or settlement communications to resolve the dispute.

12. On August 18, 2025, counsel for Lambcon notified the EEOC that "I have spoken to my client and they are not interested in conciliating this matter."

13. That same day, the EEOC issued a Right to Sue Letter. This Complaint is timely filed within ninety days of receipt of that notice.

14. Mr. Grant has fully exhausted his administrative remedies with the EEOC. All administrative conditions precedent to filing this lawsuit have been met.

## V. Factual Allegations

15. Lambcon operates a business that supplies concrete to residential and commercial construction projects primarily in East Tennessee. Lambcon employs over one hundred and fifty (150) employees. It has six plants with about 25 employees at each plant, and it has more than 100 trucks.

16. Lambcon is a family owned and operated business also known as Bradley Concrete and Lambcon Ready-Mix. The business has been in the Lambert family for over fifty years. Brothers Kirk Lambert and Adam Lambert are currently involved in running the business.

17. Mr. Grant was employed by Lambcon from May 2024 until July 18, 2024 as a Concrete Mixer Driver. A woman who performs human resources duties for Lambcon hired him based on his experience driving concrete mixer trucks. Mr. Grant did not meet any of the owners until after Lambcon hired him.

18. Mr. Grant's employment with Lambcon consisted of operating a concrete mixer truck and delivering concrete to various construction projects throughout the Knoxville area. During his orientation and training, Lambcon ended his training early to put him to work because of his experience and knowledge as a concrete mixer driver.

19. While employed by Lambcon, Mr. Grant was an employee in good standing who never received any disciplinary actions or reprimands.

20. Mr. Grant was the only Black employee working at Lambcon's Knoxville plant.

21. When Mr. Grant traveled to other Lambcon locations, he never saw another Black employee. He was told that he was the only Black employee working for Lambcon at that time.

22. Upon information and belief, there were very few or no other Black employees working for Lambcon during the time Mr. Grant was employed by Lambcon.

23. Throughout his employment with Lambcon, Mr. Grant was regularly subjected to racial jokes and slurs by co-workers and supervisors. The racial comments and jokes were a frequent occurrence and known to members of management.

24. For example, starting on Mr. Grant's first day of work, Lambcon employees began calling Mr. Grant "Snoop Dog," "Crabman,"[1] and "Bob Marley." Thereafter, Mr. Grant was frequently told that he looked like other well-known Black celebrities, and that "all Black people look alike."

25. The first time Mr. Grant met owner Adam Lambert, the interaction involved only a brief introduction and exchange of names. The second time Mr. Grant interacted with him, Lambert acted angrily toward Mr. Grant for no reason and began referring to Mr. Grant as "Boy" rather than using his name.

26. Mr. Grant was almost thirty years old at that time, so when Lambert called him "Boy," Mr. Grant perceived this as a condescending and humiliating racial slur.

27. Mr. Lambert did not refer to white employees as "Boy." As the owner, Mr. Lambert set the tone for the type of behavior that was acceptable in the workplace.

---

[1] The Crabman character on *My Name is Earl* is a former assassin who works at a crab shack.

28. Other examples that provide additional context depicting the work environment include: an occasion when a coworker told Mr. Grant how he rode his motorcycle through a predominantly Black town in Georgia wearing a Confederate flag on the back of his jacket or vest. The coworker understood that his attire was offensive to African Americans because he was proudly making the point to Mr. Grant that he felt unsafe in that location specifically because of the Confederate flag he wore.

29. On another occasion, this same coworker pulled out his penis while standing near Mr. Grant so that Mr. Grant could not see him until the group of coworkers standing around began to snicker, which caused Mr. Grant to look around and realize what was happening. Mr. Grant promptly left the area feeling humiliated as the object of his joke.

30. On another occasion when Mr. Grant mentioned that he had to pay a steep fine for a speeding ticket, a coworker bragged that he had been in the same court for the same infraction but was not required to pay a fine due to "white privilege."

31. On another occasion, when Mr. Grant got concrete on his hands and was spraying it with water to remove it, he was told by an employee that he "couldn't wash the black off of [himself]."

32. Mr. Grant tried to ignore the comments and avoid the offending parties, hoping the insensitive jokes and name-calling would eventually stop.

33. Mr. Grant's supervisors, Doug [last name unknown] and Joe Spurr, were aware of the name-calling and inappropriate comments but neither took any action to address it.

34. It was about a week before Lambcon discharged Mr. Grant when owner Adam Lambert berated him for no reason, calling him "Boy." Specifically, Mr. Grant's truck had been overfilled with too much concrete to be driven safely, so he pulled over to pour off a few blocks

of concrete as needed to safely drive to the jobsite. Mr. Grant poured the excess concrete into sellable blocks as he was expected to do in that circumstance. Mr. Lambert had no reason to be upset because he could still profit from the blocks and he did not berate or yell at white employees for doing the same thing.

35. Mr. Lambert's unnecessarily angry tone and blatantly discriminatory and dehumanizing "name" for Mr. Grant was upsetting to him.

36. To make matters worse, a coworker had told Mr. Grant that Adam Lambert had beaten up an African American employee who previously worked for Lambcon. This made Mr. Grant feel concerned about his safety.

37. Because the owner was setting the tone and participating in the offensive behavior, Mr. Grant felt hopeless that he could change the situation by complaining about it. Additionally, he feared losing his job, which was the only source of income to provide for his wife and two young children.

38. On July 18, 2024, Mr. Grant arrived at work on time. He then asked his supervisor, Doug, for permission to quickly stop by a nearby gas station to refuel his wife's car before loading his concrete truck for the day.

39. Mr. Grant received permission from Doug to run this errand. Within about ten minutes, Mr. Grant returned to the Lambcon plant with ample time to prepare and load his truck for the day.

40. Lambcon had no policy requiring employees to load trucks in any particular order.

41. After Mr. Grant loaded his truck and left for the jobsite, he made a brief stop along his route to purchase two cigarettes at a convenience store drive-through window. He had been making this stop daily since he started working at Lambcon.

42. Neither Mr. Spurr nor Doug mentioned any concerns to Mr. Grant about his morning routine. From early in his employment, Mr. Grant had shared with them and others that he was trying to quit smoking but allowed himself these two cigarettes each day.

43. Had anyone ever told Mr. Grant that he should change his routine or should not stop at the drive-through window, then he would have complied with any such instructions.

44. Moreover, errands like this were routine among his coworkers, and Lambcon's white employees regularly stopped at nearby gas stations throughout their workdays to purchase food, water, cigarettes, or other personal necessities.

45. After Mr. Grant made this brief stop along his regular route, he proceeded to drive directly to the jobsite.

46. Because Mr. Grant had been the last in line to load his truck that morning, he was also the last truck to arrive at the jobsite.

47. Mr. Grant caused no delay at the jobsite that morning.

48. However, upon arriving at the jobsite, Adam Lambert angrily approached Mr. Grant in his truck, walking toward him with one hand balled into a fist and shouting that Mr. Grant was tardy. When Mr. Grant attempted to speak to Mr. Lambert, Lambert continued yelling.

49. As he had done previously, Mr. Lambert used the degrading racial slur "Boy" multiple times in an aggressive manner when confronting Mr. Grant.

50. Mr. Grant exited his truck while Mr. Lambert continued to verbally attack him, at one point stating angrily, "I'm a nice guy until I'm not," and "you work for me, Boy."

51. In addition to verbally attacking Mr. Grant, Lambert put his finger in Mr. Grant's face and tried to pick a fight with him by physically bumping his own chest against Mr. Grant's

chest, forcing Mr. Grant to walk backwards to avoid the altercation and further abusive contact from Lambert.

52. This verbal and physical assault by Lambert caused Mr. Grant to fear for his safety.

53. Mr. Grant understood this aggressive behavior by the owner to be discriminatory and severely harassing based on his race. Lambert did not treat his white employees that way.

54. Despite Mr. Lambert's threatening, outrageous, and upsetting behavior, after Mr. Lambert left, Mr. Grant did his best to proceed with his required duties, such as emptying and cleaning his truck.

55. At the same time, Mr. Grant promptly called one of his supervisors, Doug, to inform him about the situation and express his wishes to file a complaint with Lambcon human resources personnel (HR).

56. The call to Doug took place at 8:54 that morning. Doug told Mr. Grant to call his other supervisor, Knoxville plant manager Joe Spurr, to give him the same updates.

57. Mr. Grant then promptly called Mr. Spurr to tell him about the incident and that he intended to report the incident to Lambcon's HR personnel. In response, Mr. Spurr told Mr. Grant to stop by the plant office to discuss the situation further.

58. Upon arriving at the plant office, Doug and Mr. Spurr told Mr. Grant that he could not report the incident because Mr. Lambert was the co-owner of the company.

59. Mr. Spurr explained that even if Mr. Grant could make a report to HR, any such report would likely be futile because Lambcon's HR personnel were related to Mr. Lambert, and Mr. Lambert owns the business.

60. Instead, Mr. Spurr told Mr. Grant that he should seek other employment if he did not like Mr. Lambert.

61. Because Doug and Mr. Spurr told Mr. Grant that he could not file a complaint with HR, Mr. Grant asked if there was another way to report the incident. He then expressed his belief that his only recourse would be to take legal action. Mr. Spurr encouraged Mr. Grant to do what he thought was best for him and his family.

62. At no point during their conversation did Doug or Mr. Spurr mention terminating Mr. Grant's employment. During the meeting, Mr. Grant expressed his willingness to fix anything that he had done wrong but noted that he had never been told that he had done anything wrong until after he attempted to report the assault by Mr. Lambert.

63. Doug, Mr. Spurr, and Mr. Grant all agreed at the meeting that Mr. Grant would go home early to decompress from the incident but would report back to the plant the following morning for work at 6:00 a.m.

64. Because Mr. Grant did not feel safe around Mr. Lambert and saw no opportunity for meaningful recourse internally at Lambcon, he ultimately decided to file a police report that day.

65. Once he arrived back home, Mr. Grant made phone calls to determine how to report the incident with Mr. Lambert. An officer from the Knoxville Police Department met with Mr. Grant at his home and filed a police report against Mr. Lambert.

66. Later that day, Mr. Spurr called Mr. Grant to tell him that Lambcon was terminating his employment for "walking off the job."

67. In that call, Mr. Spurr admitted that he knew that Mr. Grant had not walked off the job and that he would be returning the next morning.

68. Even though Mr. Spurr acknowledged that Lambcon's stated reason for discharging Mr. Grant was false, he explained to Mr. Grant that it was not his decision and that he had concerns about standing up for Mr. Grant because he had a family to feed and could not risk losing his job.

69. Later, on the Separation Notice that Lambcon filed with the State, Defendants added other reasons for the discharge. The Separation Notice falsely states that Mr. Grant "was reprimanded for continually stopping for personal reasons while in a company vehicle and driving off route causing delays at jobsites."

70. The Separation Notice also falsely states that Mr. Grant "got upset and walked off the job" and that his "supervisor attempted to call him twice with no answer or response."

71. Lambcon's stated reasons for discharging Mr. Grant are untrue and are merely a pretext for the discriminatory and retaliatory motive to discharge Mr. Grant.

72. Mr. Grant was never reprimanded, written up, or disciplined while he was employed at Lambcon until he reported discriminatory behavior, attempted to contact HR, and expressed his intent to take legal action by filing a police report against Mr. Lambert.

73. Additionally, Mr. Grant did not "walk off the job." Mr. Grant's supervisors, Doug and Mr. Spurr, understood that he would go home early because he was distressed about the incident and would return to work the following morning at 6:00 a.m.

74. Likewise, it is demonstrably false that Mr. Grant's supervisor attempted to call him twice with no answer or response as asserted by Lambcon. Phone records contradict this assertion. Moreover, this accusation was never mentioned as a reason for discharging Mr. Grant when his supervisor called to terminate his employment.

75. After the EEOC issued its Determination finding that Lambcon had subjected Mr. Grant to racial harassment and retaliatory discharge, Lambcon obtained new counsel to ask the EEOC to reconsider its decision.

76. In its request for reconsideration, Lambcon creates new reasons for discharging Mr. Grant that were not mentioned by Lambcon when it terminated his employment, nor were those reasons mentioned to the EEOC months earlier in response to Mr. Grant's Charge.

77. Evidence that Lambcon has continued to change and add new reasons for discharging Mr. Grant further demonstrates that its stated reasons are false and a pretext to cover up discrimination and retaliation for his protected activity.

78. Lambcon discriminated against Mr. Grant and retaliated against him maliciously and with reckless indifference to his rights under the law.

79. As a result of the Defendants' unlawful actions, Mr. Grant has incurred lost wages and benefits and has suffered serious emotional distress, mental anguish, embarrassment, and harm to his reputation, among other damages.

## VI. Causes of Action

### Count 1: Harassment and Hostile Work Environment in Violation of Title VII

80. Mr. Grant re-alleges and incorporates herein the preceding paragraphs.

81. Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a) when they subjected Mr. Grant to harassment on the basis of his race.

82. Defendants engaged in or condoned discriminatory harassment of Mr. Grant that was sufficiently severe or pervasive to create a hostile work environment for him.

Count II: Discriminatory Discharge
in Violation of Title VII and 41 U.S.C. § 1981

83. Mr. Grant re-alleges and incorporates herein the preceding paragraphs.

84. Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and Section 1981 of the Civil Rights Act of 1866 when they terminated Mr. Grant's employment on the basis of his race.

85. Defendants treated Mr. Grant less favorably than similarly situated white employees who engaged in the same or similar conduct.

86. Defendants terminated Mr. Grant's employment on the basis of his race, thus violating Title VII and interfering in the enforcement of his employment contract in violation of 41 U.S.C. § 1981.

Count III: Retaliation and Retaliatory Discharge
in Violation of Title VII and 41 U.S.C. § 1981

87. Mr. Grant re-alleges and incorporates herein the preceding paragraphs.

88. Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and Section 1981 of the Civil Rights Act of 1866 when they terminated Mr. Grant's employment in retaliation for his protected activity reporting and opposing harassment and discrimination on the basis of his race.

89. Mr. Grant engaged in protected activity when he reported discriminatory harassment to his supervisors and expressed his desire to file a complaint with the Defendants' human resources personnel and otherwise take legal action to report and oppose the harassment.

90. Defendants were aware of Mr. Grant's protected activity.

91. In retaliation for his protected activities, Defendants took materially adverse actions against Mr. Grant that would dissuade a reasonable worker from asserting his rights or reporting or complaining about unlawful discrimination.

92. Defendants terminated Mr. Grant's employment in retaliation for his protected activity.

93. Defendant's actions constitute unlawful retaliation in violation of Title VII and 42 U.S.C §1981.

**Prayer for Relief**

94. Mr. Grant requests that the Court grant him the following relief:

a. Enter judgment for Mr. Grant and against Defendants; declare that the actions of Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and enjoin the Defendants from further discriminatory practices;

b. Order Defendants to make Mr. Grant whole by providing appropriate backpay with prejudgment interest, in an amount to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including an appropriate amount to offset increased tax consequences of any lump sum payment.

c. Order Defendants to reinstate Mr. Grant or, in the alternative, to award him front pay, including value of future lost benefits;

d. Award Mr. Grant compensatory damages in an amount to be determined by a jury;

e. Award Mr. Grant punitive damages in an amount to be determined by a jury;

f. Award Mr. Grant reasonable attorney's fees and costs of this cause;

g. Award Mr. Grant interest and any other relief this Court deems just, proper, and equitable.

Plaintiff Grant requests a jury trial in this cause.

VINTON ANTONIO GRANT, II

Respectfully submitted by his attorneys,

s/ *Jennifer B. Morton*
Jennifer B. Morton, BPR #015585
Summer H. McMillan, BPR #025244
JENNIFER MORTON LAW, PLLC
8217 Pickens Gap Road
Knoxville, TN 37920
(865) 579 0708
(865) 579-0787 (fax)
jen@jmortonlaw.com
summer@jmortonlaw.com